547 F.2d 633
 9 ERC 1149, 178 U.S.App.D.C. 336, 6
Envtl. L. Rep. 20,615
 NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Petitioners,
v.
UNITED STATES NUCLEAR REGULATORY COMMISSION and United
States of America, Respondents,
Vermont Yankee Nuclear Power Corporation, Intervenor.
NATURAL RESOURCES DEFENSE COUNCIL, INC., and Consolidated
National Intervenors, Petitioners,
v.
UNITED STATES NUCLEAR REGULATORY COMMISSION and United
States of America, Respondents,
Baltimore Gas and Electric Co. et al., Intervenors.
 Nos. 74-1385, 74-1586.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 27, 1975.
Decided July 21, 1976.
As Amended Oct. 8, 1976.
Certiorari Granted Feb. 22, 1977.
See 97 S.Ct. 1098.
 
 George W. Mayo, Jr., Washington, D. C., with whom Robert M. Jeffers, David J. Hensler, Patrick M. Raher, Richard E. Ayres and Anthony Z. Roisman, Washington, D. C., were on the brief for petitioners in No. 74-1385.
 David Hensler and Patrick M. Raher, Washington, D. C., with whom Robert M. Jeffers, George W. Mayo, Jr., Richard E. Ayres and Anthony Z. Roisman, Washington, D. C., were on the brief for petitioners in No. 74-1586.
 James A. Glasgow, Atty., U. S. Nuclear Regulatory Commission, Washington, D. C., with whom Wallace H. Johnson, Asst. Atty. Gen., Edmund B. Clark, John J. Zimmerman, Attys., Dept. of Justice, Raymond M. Zimmet, Acting Sol., U. S. Nuclear Regulatory Commission, Washington, D. C., were on the brief for respondents. Marcus A. Rowden, Jerome Nelson, Joseph DiStefano, Washington, D. C., and Guy H. Cunningham, III, Attys., U. S. Nuclear Regulatory Commission and George R. Hyde and Edward J. Shawaker, Attys., Dept. of Justice, Washington, D. C., also entered appearances for respondents.
 
 
 1
 George C. Freeman, Jr., Richmond, Va., with whom W. Taylor Reveley, III, David S. Brollier and F. Case Whitlemore, Richmond, Va., were on the brief for intervenor, Baltimore Gas and Electric Co. in No. 74-1586.
 
 
 2
 Thomas G. Dignan, Jr., Boston, Mass., for intervenor, Vermont Yankee Nuclear Power Corp. in No. 74-1385.
 
 
 3
 Louis J. Lefkowitz, Atty. Gen., of the State of New York, and John F. Shea, III, Asst. Atty. Gen., New York City, of the State of New York, filed a brief on behalf of the State of New York as amicus curiae, urging reversal.
 
 
 4
 Arvin E. Upton, Washington, D. C., Harry H. Voight, New York City, and Eugene R. Fidell, Washington, D. C., filed a brief on behalf of Commonwealth Edison Co., Consolidated Edison Co. of New York, Inc., Niagara Mohawk Power Corp., Omaha Public Power District Powers Authority of the State of New York and Rochester Gas and Electric Corp., as amicus curiae urging affirmance.
 
 
 5
 Before BAZELON, Chief Judge, EDWARDS,* Circuit Judge for the Sixth Circuit, and TAMM, Circuit Judge.
 
 
 6
 Opinion for the Court filed by Chief Judge BAZELON.
 
 
 7
 Separate statement of Chief Judge BAZELON.
 
 
 8
 Separate statement filed by Circuit Judge TAMM, concurring in the result.
 
 BAZELON, Chief Judge:
 
 9
 The problems posed in both these cases relate to the manner and extent to which information concerning the environmental effects of radioactive wastes must be considered on the public record in decisions to license nuclear reactors.
 
 I. INTRODUCTION
 
 10
 Appeal number 74-1385 involves a proceeding to license a specific nuclear reactor (the Vermont Yankee Nuclear Power Station located near Vernon, Vermont). Pursuant to the National Environmental Policy Act,[1] petitioners[2] sought consideration of the environmental effects of that portion of the "nuclear fuel cycle"[3] attributable to operation of that reactor. The Appeal Board held that Licensing Boards[4] must consider the environmental effects of transportation of fuel to a reactor and of wastes to reprocessing plants, but need not consider the "operations of the reprocessing plants or the disposal of wastes" in individual licensing proceedings. In re Vermont Yankee Nuclear Power Corp., ALAB-56, 4 AEC 930 (June 6, 1972), I-J.A. 72, 76.[5]
 
 
 11
 Appeal number 74-1586 involves a rulemaking proceeding which the Commission instituted shortly thereafter with specific reference to the Vermont Yankee decision. The purpose of the rulemaking was to reconsider whether environmental effects of all stages of the uranium fuel cycle should be included in the cost-benefit analysis for licensing individual reactors. 37 Fed.Reg. 24191 (Nov. 15, 1972), II-J.A. 1. The Commission concluded the environmental effects of the fuel cycle, including waste disposal, were "relatively insignificant,"[6] but that it was preferable to take them into account. Therefore, a rule was promulgated requiring a series of specified numerical values (set out as Table S-3 accompanying the rule) be factored into the cost-benefit analysis for an individual reactor. These values are intended to represent the incremental contribution of an additional reactor to the environmental effect of the fuel cycle. The rule further provides that in addition to Table S-3, "No further discussion of such environmental effects shall be required."[7] Finally, it is declared that "(i)nsofar as this rule differs" from that announced in the Vermont Yankee decision, supra, that decision shall have "no further precedential significance." Id.
 
 II. VERMONT YANKEE (74-1385)
 
 12
 It is undisputed that a reactor licensing is a "major Federal action () significantly affecting the quality of the human environment" which requires a "detailed" environmental impact statement under § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C). That section requires an impact statement to consider, inter alia,
 
 
 13
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 
 
 14
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 
 
 15
 The plain meaning of this language encompasses radioactive wastes generated by the operations of a nuclear power station, just as it does the stack gases produced by a coal-burning power plant.
 
 
 16
 Nor are the wastes generated by the subject reactor de minimis. We were informed at argument that the Vermont Yankee plant will produce approximately 160 pounds of plutonium wastes annually during its 40-year life span.[8] Plutonium is generally accepted as among the most toxic substances known; inhalation of a single microscopic particle is thought to be sufficient to cause cancer.[9] Moreover, with a half-life of 25,000 years, plutonium must be isolated from the environment for 250,000 years before it becomes harmless. Operation of the facility in question will also produce substantial quantities of other "high-level"[10] radioactive wastes in the form of strontium-90 and cesium-137 which, with their shorter, 30-year half-lives, must be isolated from the environment for "only" 600 to 1000 years.[11]
 
 
 17
 The Appeal Board advanced two major arguments to justify its decision that reprocessing and waste disposal issues need not be considered at the licensing stage: (1) that these issues are too speculative; and (2) that they are more appropriately considered when reprocessing and waste disposal facilities are themselves licensed. We turn now to these contentions.
 
 
 18
 The Board agreed that "there will be an incremental environmental effect ultimately resulting from the operation of this reactor as the result of the operation of whatever reprocessing and disposal grounds may from time to time be used during the life of the plant."[12] In its opinion, however, these effects were too "contingent and presently indefinable" to be evaluated at the time of licensing in view of the 40-year expected life of the reactor. The Board wrote:
 
 
 19
 It is evident to us that evaluation of the environmental effects of the operation of one or more unidentifiable reprocessing plants, employing separation processes which are unidentified and which may or may not now be known or used, during the course of the forty-year life of the plant, is not possible at this time and in this proceeding.
 
 
 20
 I-J.A. 82. This approach was decisively rejected in SIPI, supra, note 11, 481 F.2d at 1092. There we held that the obligation to make reasonable forecasts of the future is implicit in NEPA and therefore an agency cannot "shirk (its) responsibilities under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry.' " "Meaningful information" concerning the effects of waste reprocessing and disposal technology is presently available, see SIPI, 481 F.2d at 1094, 1096. As the Board noted, a reprocessing plant has been operated by the Commission for some time, and additional plants are under construction. I-J.A. 79. The possibility that improved technology may be developed during the 40-year life span of a reactor does not render consideration of environmental issues too speculative, as the Board appears to suggest. NEPA's requirement for forecasting environmental consequences far into the future implies the need for predictions based on existing technology and those developments which can be extrapolated from it.[13]
 
 
 21
 As more and more reactors producing more and more waste are brought into being, "irretrievable commitments (are) being made and options precluded," see SIPI, 481 F.2d at 1094, 1098, and the agency must predict the environmental consequences of its decisions as it makes them. See Aberdeen & Rockfish R.R. v. SCRAP, 422 U.S. 289, 320, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975).
 
 
 22
 The second argument advanced by the Board is that licensing proceedings for reprocessing plants are a more "appropriate proceeding" in which to weigh the environmental effects of reprocessing and waste disposal. I-J.A. 86. Licensing of a reprocessing plant or waste disposal facility is itself a "major Federal action" affecting the environment which requires a NEPA statement. The real question posed by the Board's opinion is whether the environmental effects of the wastes produced by a nuclear reactor may be ignored in deciding whether to build it because they will later be considered when a plant is proposed to deal with them. To answer this question any way but in the negative would be to misconstrue the fundamental purpose of NEPA.[14] Once a series of reactors is operating, it is too late to consider whether the wastes they generate should have been produced, no matter how costly and impractical reprocessing and waste disposal turn out to be; all that remain are engineering details to make the best of the situation which has been created.[15] NEPA's purpose was to break the cycle of such incremental decision-making:
 
 
 23
 Policy is established by default and inaction. Environmental problems are only dealt with when they reach crisis proportion. . . . Important decisions concerning the use and shape of man's environment continue to be made in small but steady increments which perpetuate rather than avoid the recognized mistakes of previous decades.
 
 
 24
 Senate Rep. No. 296, 91st Cong., 1st Sess. 5 (1969). Decisions to license nuclear reactors which generate large amounts of toxic wastes requiring special isolation from the environment for several centuries are a pardigm of "irreversible and irretrievable commitments of resources" which must receive "detailed" analysis under § 102(2)(C)(v) of NEPA, 42 U.S.C. § 4332(2)(C)(v).[16] We therefore hold that absent effective generic proceedings to consider these issues, they must be dealt with in individual licensing proceedings.[17]
 
 
 25
 The order granting a full-term license for the Vermont Yankee plant is hereby remanded to await the outcome of further proceedings in the rulemaking, discussed hereafter.
 
 III. RULEMAKING (74-1586)
 
 26
 (A.)
 
 
 27
 The notice of proposed rulemaking, 37 Fed.Reg. 24191 (Nov. 15, 1972), suggested as a possible alternative to the rule of Vermont Yankee, supra, that a series of specified numerical values (set out as Table S-3 in the notice) be factored into the cost-benefit analysis for individual reactors.[18] These values were intended to represent the incremental contribution of a hypothetical 1000 MWe model light water reactor to the total environmental effect of the uranium fuel cycle. While expressed as numerical values in Table S-3, a fair summary of the conclusions incorporated into the rule is that the environmental effects of the fuel cycle are "insignificant."[19] The notice further stated that the "supporting data for this summary table" is contained in a staff document entitled the "Environmental Survey of the Nuclear Fuel Cycle" (Nov. 6, 1972) (hereafter "Environmental Survey"), which was simultaneously made public.[20]
 
 
 28
 An "informal rulemaking hearing" of the "legislative-type" was scheduled to receive comments in the form of "oral or written statements."[21] By subsequent notice, the Commission designated a three-member hearing board to preside, and reiterated, "The procedural format for the hearing will follow the legislative pattern, and no discovery or cross-examination will be utilized." 38 Fed.Reg. 49 (Jan. 3, 1973).[22]
 
 
 29
 The primary argument advanced by the public interest intervenors is that the decision to preclude "discovery or cross-examination" denied them a meaningful opportunity to participate in the proceedings as guaranteed by due process. They do not question the Commission's authority to proceed by informal rulemaking, as opposed to adjudication. They rely instead on the line of cases indicating that in particular circumstances procedures in excess of the bare minima prescribed by the Administrative Procedure Act, 5 U.S.C. § 553, may be required.[23]
 
 
 30
 The Government concedes that "basic considerations of fairness may under exceptional circumstances" require additional procedures in "legislative-type proceedings," but contends that the procedures here were more than adequate.[24] Thus, we are called upon to decide whether the procedures provided by the agency were sufficient to ventilate the issues.[25]
 
 
 31
 A few general observations are in order concerning the role of a court in this area. Absent extraordinary circumstances, it is not proper for a reviewing court to prescribe the procedural format which an agency must use to explore a given set of issues.[26] Unless there are statutory directives to the contrary, an agency has discretion to select procedures which it deems best to compile a record illuminating the issues.[27] Courts are no more expert at fashioning administrative procedures than they are in the substantive areas of responsibility which are left to agency discretion.[28] What a reviewing court can do, however, is scrutinize the record as a whole to insure that genuine opportunities to participate in a meaningful way were provided, and that the agency has taken a good, hard look at the major questions before it.
 
 
 32
 We have sometimes suggested that elucidation of certain types of issues, by their very nature, might require particular procedures, including cross-examination.[29] In fact, we have been more concerned with making sure that the record developed by agency procedures discloses a thorough ventilation of the issues than with what devices the agency used to create the dialogue.[30]
 
 
 33
 Of necessity, assessing agency procedures requires that the reviewing court immerse itself in the record. Abstract characterizations are an unsatisfactory guide for determining what procedures are necessary in particular proceedings.[31] Alternative procedural techniques are usually available, and the absence of one device, such as cross-examination, may be compensated for by the sensitive use of substitutes.[32] If review is to be meaningful, it must focus on the actual operation of the whole range of procedures in a particular setting including "context of fact, statutory framework and nature of action."[33]
 
 
 34
 A prominent feature of the statutory context created by NEPA is the requirement that the agency acknowledge and consider "responsible scientific opinion concerning possible adverse environmental effects" which is contrary to the official agency position. (see, e. g., infra note 51). Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. 380, 463 F.2d 783, 787 (1971). NEPA requires that agencies see to it that "the officials making the ultimate decision (are) informed of the full range of responsible opinion on the environmental effects in order to make an informed choice." Id. The decision to proceed by rulemaking neither relieves the Commission of this obligation, nor permits it to depend solely on whatever contributions intervenors happen to make to develop a fair representation of scientific opinion for the record.[34]
 
 
 35
 In order to determine whether an agency has lived up to these responsibilities, a reviewing court must examine the record in detail to determine that a real give and take was fostered on the key issues. This does not give the court a license to judge for itself how much weight should be given particular pieces of scientific or technical data, a task for which it is singularly ill-suited. It does require, however, that the court examine the record so that it may satisfy itself that the decision was based "on a consideration of the relevant factors."[35] Where only one side of a controversial issue is developed in any detail, the agency may abuse its discretion by deciding the issues on an inadequate record.
 
 
 36
 A reviewing court must assure itself not only that a diversity of informed opinion was heard, but that it was genuinely considered. "(T)he dialogue that the APA's rulemaking section contemplates cannot be a sham."[36] Since a reviewing court is incapable of making a penetrating analysis of highly scientific or technical subject matter on its own, it must depend on the agency's expertise, as reflected in the statement of basis and purpose, to organize the record, to distill the major issues which were ventilated and to articulate its reasoning with regard to each of them.[37]
 
 
 37
 An agency need not respond to frivolous or repetitive comment it receives. However, where apparently significant information has been brought to its attention, or substantial issues of policy or gaps in its reasoning raised, the statement of basis and purpose must indicate why the agency decided the criticisms were invalid.[38] Boilerplate generalities brushing aside detailed criticism on the basis of agency "judgment" or "expertise" avail nothing; what is required is a reasoned response, in which the agency points to particulars in the record which, when coupled with its reservoir of expertise, support its resolution of the controversy.[39] An agency may abuse its discretion by proceeding to a decision which the record before it will not sustain, in the sense that it raises fundamental questions for which the agency has adduced no reasoned answers.
 
 
 38
 (B.)
 
 
 39
 With these observations in mind, we turn to our examination of this record. The significance of Table S-3 is that it expresses in numerical terms the conclusion that the environmental effects of the fuel cycle, including waste disposal, are insubstantial.[40] The primary basis for these judgments is the data assembled by the staff in the draft Environmental Survey made public with the proposed rule. The conclusions reached by the staff in the Environmental Survey were in turn adopted without modification by the Commission as Table S-3 and embodied in the final rule. Thus, support for a rule limiting consideration of environmental issues to the numbers in Table S-3 must be found in one of three places: the Environmental Survey, the back-up documentation to which it refers, and the oral and written testimony offered at the hearing. It is to these sources we must look for a thorough ventilation of the underlying issues.
 
 
 40
 The Environmental Survey made public prior to the hearing was intended to "provide() a basis for an informed consideration of the . . . environmental impact associated with the uranium fuel cycle . . . (and to) contain () extensive references to background documents available to members of the public." 38 Fed.Reg. 49 (Jan. 3, 1973). Regarding most phases of the fuel cycle, these promises were fulfilled and the Environmental Survey did an adequate, even admirable job, of describing the processes involved. It assembles data on the consumption of resources, and discusses the risks of accidents and other hazards in detail, supporting the staff's conclusions with numerous references to the scholarly literature and to technical reports on file with the Commission. However, with regard to the two phases of the fuel cycle which are the focal points for this appeal, reprocessing and waste disposal,[41] that kind of detailed explanation and support for the staff's conclusions was noticeably absent from the Environmental Survey as originally published.
 
 
 41
 The only discussion of high-level waste disposal techniques was supplied by a 20-page statement by Dr. Frank K. Pittman, Director of the AEC's Division of Waste Management and Transportation. This statement, delivered during the oral hearings, was then incorporated, often verbatim, into the revised version of the Environmental Survey published after the comment period.[42] Dr. Pittman began his statement by acknowledging that he was "broadly involved" with the subject of high-level waste management since he heads the division of the AEC charged with "responsibility for the development, construction and operation of facilities for ultimate management of commercial high-level waste."[43]
 
 
 42
 Dr. Pittman proceeded to describe for the first time in public the "design concepts" for a federal surface repository for retrievable storage of high-level waste.[44] This is essentially a warehouse in which sealed canisters containing cylinders of solidified nuclear wastes can be stored in water-filled basins recessed into the ground on a temporary basis (up to 100 years), until such time as a permanent waste disposal scheme is devised, when they can be removed.[45] While the "intended life" of the facility is only 100 years, some high-level wastes must be isolated for up to 250,000 years. See supra p. --- of 178 U.S.App.D.C., 638 of 547 F.2d. Therefore, the Environmental Survey states, without further explanation, that in the future a "permanent" Federal repository for "geologic storage of high-level wastes" will be established and that the "Federal government will have the obligation to maintain control over the site in perpetuity." II-J.A. 724 (emphasis added).
 
 
 43
 Until recently the AEC planned to dispose of wastes by burying them deep inside abandoned salt mines. These plans were postponed indefinitely after a series of technical difficulties, including the discovery the salt mines might be susceptible to underground flooding. The Revised Environmental Survey devotes two sentences to recounting how prior waste disposal plans fared:
 
 
 44
 It was planned to construct a Federal repository in a salt mine for long-term geological storage of solid high-level wastes by the mid 1970's. However, subsequent events have deferred the site selection and construction of such a facility.
 
 
 45
 II-J.A. 724. The "subsequent events" which led to the shelving of the salt mine plan are not discussed.[46]
 
 
 46
 Dr. Pittman's description of the new plan now also postponed indefinitely[47] to build a surface storage facility can only fairly be described as vague, but glowing. He begins:
 
 
 47
 . . . I hope I will be able to allay what I feel are unwarranted fears . . . and show that the bugaboo of waste management cannot logically be used as a rationale for delays in the progress of an essential technology for meeting our growing power demands.
 
 
 48
 (T)here are available today proven methods for managing the high-level waste from the nuclear industry in a way which will assure first that man will not be adversely affected by the radioactivity either by external or internal contact with the waste itself or by exposure to the penetrating radiation which it generates, and second that the environment (sic) effects will be very small.
 
 
 49
 II-J.A. 59-60. In less than two pages, he set out a very general description of what the facility is supposed to do, II-J.A. 63-66, accompanied by several schematic drawings. These show the facility will have a cooling system, a transfer area and storage basins, but do not attempt to describe how they will be built and operated, what materials will be used, where such a facility might be located, or what it might cost to build and operate.
 
 
 50
 Dr. Pittman then explains that "the major factor in the design of the repository for high-level waste is the technique used to remove the heat from the waste." II-J.A. 63. Decaying radioactive waste spontaneously gives off substantial heat and "(s)hould adequate provisions not be made to remove this heat . . . , the waste and the canister would melt." Id. A "meltdown" would result in what Dr. Pittman calls a "situation of considerable concern," which would involve the "loss of some fraction of the isolation of the radioactive material from the environment." II-J.A. 65. No attempt is made to describe how serious a radioactivity hazard would be presented.
 
 
 51
 In a paragraph which is carried over verbatim in the Revised Environmental Survey, II-J.A. 726, Pittman states:
 
 
 52
 The Commission has carried out extensive evaluations of safety, reliability, operability, maintainability and economics of various methods for removing heat, and has essentially narrowed the area for further study to techniques using either water or air as the heat transfer medium.
 
 
 53
 II-J.A. 64. No citations are given for these studies; in fact, there are no references to back-up materials supporting any of Pittman's statement, or those portions of the Revised Environmental Survey drawn from it.[48]
 
 
 54
 Again without benefit of details, Dr. Pittman offers conclusory reassurances that the proposed facility will be designed so that the possibility of a "meltdown" can be dismissed as "incredible":
 
 
 55
 The probability of this situation occurring is prevented by a combination of engineered features including, (i) redundancy of power supply and other essential cooling systems; (ii) structural strength to withstand credible forces of nature earthquake, tornado, etc.; (iii) combination of structural strength, plant security, etc., to withstand credible overt forces of man; (iv) modular basin cell construction which limits the number of canisters subject to a single catastrophic event.
 
 
 56
 Thus, before a meltdown could occur, it would be necessary to have a series of failures of systems which will be engineered, constructed, and operated for maximum reliability under rigorous quality assurance programs before a situation could occur where sufficient water could not be added to and maintained in the cell to keep it from leaking or boiling dry. The timing for such a series of failures to result in uncorrectable situations is important. The individual failure of power systems for circulating the coolant would not result in pool water boiling for at least 16 hours. Various corrective actions may be taken any time within a week which would prevent cell water from boiling away. After the complete loss of water, an additional day would be required before the waste would begin to melt. The number of sequential failures required of highly reliable systems, combined with the long time periods available for repair and recovery from each, result in the judgment that this is an incredible incident.
 
 
 57
 II-J.A. 65-66. His unadorned conclusion is in turn incorporated verbatim into the Revised Environmental Survey.[49]
 
 
 58
 Other than the broad reference to "structural strength, plant security, etc., to withstand credible overt forces of man", there is no discussion of how the facility would be protected from terrorism.[50] While Dr. Pittman says "(v) arious corrective actions" might be taken to prevent a meltdown, none are specified.
 
 
 59
 Dr. Pittman concludes with the judgments that:
 
 
 60
 . . . (1) the program being followed by the industry under AEC regulation and by the AEC offers assurance that the commercial high-level waste will be managed safely from its initial production; (2) the surface storage method, to be used by the AEC, is good for as long as adequate human surveillance and maintenance effort is continued; (3) the probability that work currently under way will demonstrate the use of bedded salt as a safe, acceptable, ultimate disposal method within the next ten to fifteen years is very high; (4) should bedded salt not prove to be acceptable other acceptable geologic disposal concepts offer reasonable probability of reaching a point of acceptability within two or three decades; and (5) the waste in initial storage will be easily retrievable for either near- or far-term disposal methods when they are developed.
 
 
 61
 II-J.A. 82. There is no discussion of how "adequate human surveillance and maintenance" can be assured for the periods involved, nor what the long-term costs of such a commitment are, nor of the dangers if surveillance is not maintained.[51] Nor is any explanation offered for Dr. Pittman's optimism regarding bedded salt as a disposal method, since the problems which have surfaced and delayed that program are not mentioned.[52] Nor does the statement anywhere describe what "other acceptable geologic disposal concepts" are under consideration.
 
 
 62
 Based on Dr. Pittman's statement, the Revised Environmental Survey concludes that the resources consumed in waste storage will be minimal, that "under normal conditions" no radioactivity will be released, and that the possibility of a serious accident is "incredible."[53] In short, based on the information in Dr. Pittman's statement, the Commission concluded that the future environmental effects from the disposal of high-level nuclear wastes are negligible. This conclusion is in turn embodied in Table S-3, and further consideration of the issue terminated.
 
 
 63
 We do not dispute these conclusions. We may not uphold them, however, lacking a thorough explanation and a meaningful opportunity to challenge the judgments underlying them. Our duty is to insure that the reasoning on which such judgments depend, and the data supporting them, are spread out in detail on the public record. Society must depend largely on oversight by the technically-trained members of the agency and the scientific community at large to monitor technical decisions. The problem with the conclusory quality of Dr. Pittman's statement and the complete absence of any probing of its underlying basis is that it frustrates oversight by anyone: Commission, intervenors, court, legislature or public. Given the opportunity, Dr. Pittman might have provided convincing answers to many of the questions which his statement leaves untouched. Since that did not occur, however, his judgments must either be accepted at face value, or rejected out of hand.
 
 
 64
 Although the vagueness of the presentation regarding waste disposal made detailed criticism of its specifics impossible, see II-J.A. 257, the public interest intervenors did offer a number of more general comments concerning the Commission's approach. They criticized the Commission for a general "failure to distinguish between design objectives on the one hand and performance on the other," II-J.A. 124, noting that no consideration had been given actual experience with storage of wastes generated by weapons production. II-J.A. 272-74. They also questioned confident assertions by the AEC that long-term waste management is feasible, laying particular stress on the immense time periods involved which mock human institutions:
 
 
 65
 Except for the storage of liquid wastes in tanks, for which experience from weapons production applies, all proposals for long term storage or disposal of high level waste from the nuclear power industry lie at the research and development stage.
 
 
 66
 The impression is inescapable, in view of the present imprecise state of affairs, that no convincing statements exist regarding the long term environmental impact attending the storage and/or disposal of wastes from fuel reprocessing.
 
 
 67
 The times during which radioactive wastes must remain secure from the biosphere have no parallel in human affairs. Eight hundred years are required for fission products alone and millions of years if the fission products continue to be contaminated with transuranic elements at present levels. Fission technology requires that man issue guarantees on events far into the future, and it is not clear in most cases how this can be done. Institutional arrangements do not exist and never have existed to guarantee the monitoring of or attendance upon storage facilities over a millennium. In the range of a million years, serious geological uncertainties arise and even the survival of man may be doubtful. "In perpetuity" has little real meaning in human affairs.
 
 
 68
 II-J.A. 261-2. They reiterated repeatedly that the problems involved are not merely technical, but involve basic philosophical issues concerning man's ability to make commitments which will require stable social structures for unprecedented periods.[54]
 
 
 69
 The intervenors pointed out that storing wastes aboveground places a premium on stable human institutions for monitoring and surveillance, II-J.A. 275-76; that until plans for long-term disposal in the salt beds at Lyons, Kansas fell through, see supra note 46, the agency had itself rejected the idea of surface storage because of the surveillance problems. II-J.A. 210-11, 287-89.
 
 
 70
 After reviewing the record, the presiding hearing board isolated several areas of controversy which it felt ought to be addressed by the Commission in issuing the proposed rule. Included were the adequacy of the discussion of waste disposal systems,[55] and the need for fuller background documentation. II-J.A. 498.
 
 
 71
 The Commission disposed of these issues summarily in its statement of basis and purpose accompanying the promulgation of the rule without attempting to articulate responses to any of the points which had been raised regarding waste disposal:
 
 
 72
 Considerable information was presented at the hearing on high level waste storage utilizing a retrievable surface storage facility. A description was given of such facility, the normal radiological effluents, and a maximum credible accident.
 
 
 73
 While such a waste storage facility has not been constructed, preliminary conceptual designs have been developed using existing technology based on well established data and techniques.
 
 
 74
 The Commission believes that the Survey and hearing record provide an adequate data base for the regulation adopted.
 
 
 75
 39 Fed.Reg. 14189 (April 22, 1974); II-J.A. 507.1 (unnumbered page following 507).[56] Thus, to the limited extent that any give -and-take was fostered on the nuclear waste issues, the Commission, in its final decision, failed to address major contentions that were raised.
 
 
 76
 (C.)
 
 
 77
 In substantial part, the materials uncritically relied on by the Commission in promulgating this rule consist of extremely vague assurances by agency personnel that problems as yet unsolved will be solved. That is an insufficient record to sustain a rule limiting consideration of the environmental effects of nuclear waste disposal to the numerical values in Table S-3. To the extent that uncertainties necessarily underlie predictions of this importance on the frontiers of science and technology, there is a concomitant necessity to confront and explore fully the depth and consequences of such uncertainties. Not only were the generalities relied on in this case not subject to rigorous probing in any form but when apparently substantial criticisms were brought to the Commission's attention, it simply ignored them, or brushed them aside without answer. Without a thorough exploration of the problems involved in waste disposal, including past mistakes, and a forthright assessment of the uncertainties and differences in expert opinion, this type of agency action cannot pass muster as reasoned decisionmaking.[57]
 
 
 78
 Many procedural devices for creating a genuine dialogue on these issues were available to the agency including informal conferences between intervenors and staff, document discovery, interrogatories, technical advisory committees comprised of outside experts with differing perspectives, limited cross-examination, funding independent research by intervenors, detailed annotation of technical reports, surveys of existing literature, memoranda explaining methodology. We do not presume to intrude on the agency's province by dictating to it which, if any, of these devices it must adopt to flesh out the record. It may be that no combination of the procedures mentioned above will prove adequate, and the agency will be required to develop new procedures to accomplish the innovative task of implementing NEPA through rulemaking. On the other hand, the procedures the agency adopted in this case, if administered in a more sensitive, deliberate manner, might suffice.[58] Whatever techniques the Commission adopts, before it promulgates a rule limiting further consideration of waste disposal and reprocessing issues, it must in one way or another generate a record in which the factual issues are fully developed.
 
 
 79
 Our colleague, concurring specially, expresses the view that there is "little to be gained other than delay" by remanding for additional proceedings, since it is "almost inevitable" that the Commission will reach the same result "after fully considering the problems and alternative methods of waste disposal."[59] Even if true, that would only supply an additional reason to require the Commission to acknowledge the risks and problems, as well as lay bare its own reasoning. Agencies are less likely to persist in the face of information publicly exposing the fallacies, if any, in their position. In any event, NEPA does not guarantee a particular outcome on the merits; rather, the statute mandates only a "careful and informed decisionmaking process" to enlighten the decisionmaker and the public.[60] In the rulemaking context, that requires the Commission to identify and address information contrary to its own position, to articulate its reasoning and to specify the evidence on which it relies.[61] The Commission may well reach the same conclusion on remand. But if it does so on such a record, the Congress, the courts, and the public will all know where we stand.
 
 
 80
 It has become a commonplace among proponents of nuclear power to lament public ignorance.[62] The public the "guinea pigs" who will bear the consequences of either resolution of the nuclear controversy is apprehensive. But public concern will not be quieted by proceedings like the present.
 
 
 81
 I know no safe depository of the ultimate powers of the society but the people themselves; and if we think them not enlightened enough to exercise their control with a wholesome discretion, the remedy is not to take it from them, but to inform their discretion.[63]
 
 
 82
 The Commission's action in cutting off consideration of waste disposal and reprocessing issues in licensing proceedings based on the cursory development of the facts which occurred in this proceeding was capricious and arbitrary. The portions of the rule pertaining to these matters are set aside and remanded.[64]
 
 Separate Statement of Chief Judge BAZELON:
 
 83
 I add a word of my own on some of the broader implications of Judge Tamm's concurrence.
 
 
 84
 I agree that courts should be reluctant to impose particular procedures on an agency. For example, requiring cross-examination in a rulemaking proceeding is radical therapy, which may cause the patient to suffer a slow, painful death. "There is a not insignificant potential for havoc . . . (which is) likely to be disproportionate to the values achieved . . . ." International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 478 F.2d 615, 631 (1973). But I reject the implication that any techniques beyond rudimentary notice and comment are needless "over-formalization" of informal rulemaking. Concur at ---- of 178 U.S.App.D.C., 660 of 547 F.2d. Unhappily, no such bright line can be drawn between rulemaking and adjudicatory proceedings.[1]
 
 
 85
 The purpose of rulemaking was to allow public input on policy, whereas adjudication was designed to resolve disputed facts. See supra note 1. However, in response to the "paralysis" of the administrative process in the last decade, rulemaking has been expanded into fact-intensive areas previously thought to require adjudicatory procedures.[2] Administrative proceedings are now common which do not fit neatly into either the rulemaking or adjudicatory category. These new proceedings are "hybrids" in the sense that involve issues of general applicability which can be treated efficiently only in generic proceedings, but nonetheless involve factual components of such relative importance that a greater assurance of accuracy is required than that which accompanies notice and comment procedures.[3]
 
 
 86
 The need for reliable fact-finding does not necessarily imply transplanting trial-type procedures. Factual issues in hybrid proceedings tend to be complex scientific or technical ones involving mathematical or experimental data, or other "legislative facts"[4] peculiarly inappropriate for trial-type procedures. Agencies should innovate procedural formats responsive to the new problems created by hybrid rulemaking. Some agencies (such as FDA and EPA) have already begun to do so.[5]
 
 
 87
 Decisions in areas touching the environment or medicine affect the lives and health of all. These interests, like the First Amendment, have "always had a special claim to judicial protection."[6] Consequently, more precision may be required than the less rigorous development of scientific facts which may attend notice and comment procedures.
 
 
 88
 Despite the controversy surrounding the proper standard of review in informal rulemaking cases, see Concur at n. 2, there is less disagreement on this essential point than meets the eye. With customary perspicacity, Judge Friendly has observed that often it does not really matter much whether a court says the record is remanded because the procedures used did not develop sufficient evidence, or because the procedures were inadequate.[7] From the standpoint of the administrator, the point is the same: the procedures prescribed by § 553 will not automatically produce an adequate record. Thus, although Judge Tamm vehemently opposes the concept of procedural review of informal rulemaking, he agrees to send this case back for a fuller development of the facts even though the dictates of § 553 were followed.[8]
 
 
 89
 Of course, important differences remain from the standpoint of a reviewing court. I am convinced that in highly technical areas, where judges are institutionally incompetent to weigh evidence for themselves, a focus on agency procedures will prove less intrusive, and more likely to improve the quality of decisionmaking, than judges "steeping" themselves "in technical matters to determine whether the agency has exercised a reasoned discretion." See Ethyl Corp. v. EPA, 176 U.S.App.D.C. 373, 541 F.2d 1, No. 73-2205 (1976) (en banc) (Bazelon, C. J., concurring), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).[9]
 
 
 90
 TAMM, Circuit Judge, separate statement concurring in result:
 
 
 91
 Licensing a nuclear reactor unquestionably constitutes a "major Federal action() significantly affecting the quality of the human environment" requiring a "detailed" environmental impact statement under section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C) (1970). Approval of such a facility, which inevitably will produce high level radioactive wastes, some of which must be isolated from the "biosphere" for a quarter of a million years, undeniably necessitates an "irreversible and irretrievable commitment() of resources" within the meaning of the Act. 42 U.S.C. § 4332(2)(C)(v). A panel of this court has previously indicated that NEPA requires potential environmental problems of this magnitude to be dealt with in advance of such a substantial commitment, not ignored until new commitments inevitably follow from the old. See, e.g., Calvert Cliffs' Coordinating Comm. v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1128 (1971).[1] I agree with the majority that NEPA requires the Commission fully to assure itself that safe and adequate storage methods are technologically and economically feasible. It forbids reckless decisions to mortgage the future for the present, glibly assuring critics that technological advancement can be counted upon to save us from the consequences of our decisions. I further agree with the conclusion of the majority that it is impossible to determine from the record before us whether the Commission has fulfilled its statutory obligation under NEPA in adopting the S-3 table, in effect deciding that the incremental environmental effect of storing the waste of an additional nuclear reactor is negligible, or whether it has uncritically adopted as its own the undocumented conclusions of a single witness that the waste storage issue is a "non-problem" with which the Commission need hardly concern itself at this time. Accordingly, the inadequacy of the record demands that we remand this case to the Commission in order to ensure that it has taken a hard look at the waste storage issue. I cannot, however, without qualification, endorse the approach the majority has taken to reach this result or its suggested disposition on remand.
 
 
 92
 The majority appears to require the Commission to institute further procedures of a more adversarial nature than those customarily required for informal rulemaking by the Administrative Procedure Act, 5 U.S.C. § 553 (1970).[2] The Commission chose to proceed by "hybrid" rulemaking below, allowing petitioners to present oral arguments before the Commission and subjecting participants to questions, but not permitting participants to cross-examine. Majority, supra note 59. By so proceeding the Commission exceeded the minimum procedural requirements of section 553.[3] In my view, the deficiency is not with the type of proceeding below, but with the completeness of the record generated.[4] More procedure will not, in this case, guarantee a better record, and a better record can be generated without reopening the oral proceeding at this time. We cannot conclude confidently from this record whether the Commission's staff considered all relevant factors, including the facts petitioners call to our attention, in reaching the figures embodied in Table S-3; nor can we conclude from Dr. Pittman's oral statements, substantially devoid of documentation, whether these figures represented conclusions drawn from more exhaustive research into the waste storage problem conducted by the head of the Commission division charged with this task. If Dr. Pittman's conclusions were so based, I believe the Commission is entitled to accept them, provided, of course, it is assured that they are reasonably objective.[5]
 
 
 93
 I am also troubled by two other aspects of the majority opinion. First, I am distressed because I believe the majority opinion fails to inform the Commission in precise terms what is must do in order to comply with the court's ad hoc standard of review.[6] The majority sends the waste storage issue back to the Commission for a "thorough ventilation." This language, of course, means very little in procedural terms. In order to aid the Commission in filling in the gaps in the record, the majority enumerates a number of procedural alternatives in varying degrees of formality, some less intrusive into agency prerogatives than others. Majority, supra at 178 U.S.App.D.C. ----, 547 F.2d 653. Then, heeding the Supreme Court's admonition in FPC v. Transcontinental Gas Pipe Line Corp., 423 U.S. 326, 96 S.Ct. 579, 46 L.Ed.2d 533 (1976) (per curiam), that we may not, except in extraordinary circumstances, specify agency procedures on remand, the majority declines to give the Commission any direction as to which procedure or combination of them, will suffice. The Commission is thus left to decide which to adopt, further confused by the majority's statement that, "It may be that no combination of the procedures mentioned above will prove adequate, and the agency will be required to develop new procedures to accomplish the innovative task of implementing NEPA through rulemaking." Majority, supra at 178 U.S.App.D.C. ----, 547 F.2d 653. Such specificity resembles a standardized test in which there are numerous possible answers, including "all of the above," "none of the above," or "various combinations of the above." The result, I believe, is entirely predictable: the Commission may or may not adopt one of the majority's suggestions, but will in any case seek to comply by mechanically generating more "negative" information respecting current problems with disposal of high level radioactive wastes and then will "overcome" this information with citations to favorable studies and articles. Ultimately, of course, the Commission must decide which information to accept and which to reject, regardless of the type of procedure used. The majority opinion appears to recognize as much when it volunteers that, "On the other hand, the procedures the agency adopted in this case, if administered in a more sensitive, deliberate manner, might suffice." Majority, supra at 178 U.S.App.D.C. ----, 547 F.2d 653-654 (citation omitted). This time, however, the decision whether licensing an additional reactor is worth the additional environmental risk would be one of policy or risk assessment and, consequently, would be reviewable only according to the customary "arbitrary, capricious" standard. Amoco Oil Co. v. E. P. A., 163 U.S.App.D.C. 162, 501 F.2d 722, 741 (1974). I believe it almost inevitable that, after fully considering the problems and alternative methods of waste disposal and storage, the Commission will reach the same conclusion and therefore see little to be gained other than delay from imposing increased adversarial procedures in excess of those customarily required.[7]
 
 
 94
 This brings me to my second, related concern with the majority's approach. I believe the majority's insistence upon increased adversariness and procedural rigidity, uneasily combined with its non-direction toward any specific procedures, continues a distressing trend toward over-formalization of the administrative decisionmaking process which ultimately will impair its utility. As Judge Wright has recently noted, the administrative response to overuse of judicial imposition of such ad hoc procedural refinements is easily foreseeable. Fearing reversal, administrators will tend to over-formalize, clothing their actions "in the full wardrobe of adjudicatory procedures," until the advantages of informal rulemaking as an administrative tool are lost in a heap of judicially imposed procedure. Wright, The Courts and the Rulemaking Process: The Limits of Judicial Review, 59 Cornell L.Rev. 375, 387-88 (1974).[8] The majority's reliance upon the so-called "hybrid rulemaking" cases[9] for its conclusion that the procedures prescribed by section 553 are inadequate for resolution of the complex issues involved in this case and its insistence that the Commission adopt more formal adversary procedures are, I believe, misplaced. Admittedly, there are rare cases in which "basic considerations of fairness" require procedures more adversarial than those prescribed by section 553. See Majority, supra at 178 U.S.App.D.C. ----, 547 F.2d 641-643, quoting from Respondent's Brief at 13-14. I cannot agree, however, that this case requires us to reach this issue. Remanding an agency decision with instructions to initiate such procedures is an extraordinary judicial remedy which, I believe, should be reserved for extraordinary cases.
 
 
 95
 The appropriate remedy at this point is not to impose ad hoc procedural requirements in an attempt to raise the level of petitioners' participation, already adequate under section 553, but to remand for an explanation of the basis of Dr. Pittman's statements and of the staff's numerical conclusions,[10] i. e. for the documentation which the majority finds so conspicuously lacking.[11] The Commission should be able to supply the court with a statement of the methods by which its staff arrived at the figures embodied in Table S-3 and by which Dr. Pittman concluded that the waste storage problem is already technologically and economically soluable. If it cannot, then we will have no choice but to invalidate the Commission's rule under the "arbitrary, capricious" standard; if it can, we should defer to the administrative weighing of risks and benefits of additional reactors.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 291(a)
 
 
 [1]
 42 U.S.C. § 4321, et seq. (1970) (hereafter "NEPA")
 
 
 [2]
 Petitioners in 74-1385 are the Natural Resources Defense Council, Inc. ("NRDC") and the New England Coalition on Nuclear Pollution, Inc., voluntary organizations supported by contributions from individual members, which intervened in the licensing proceedings
 NRDC is also a petitioner in 74-1586, where it is joined by Consolidated National Intervenors, Inc. ("CNI"), a coalition of almost eighty public interest groups and individuals which actively participated in the rule-making proceedings. Several groups such as the Sierra Club and the Union of Concerned Scientists which are members of CNI also made individual presentations.
 Since on all but a few issues these groups adopted the same positions, for convenience they are referred to collectively as "public interest intervenors" in order to distinguish them from a group of 14 utility companies which also actively participated in the rulemaking. One member of that group, Baltimore Gas & Electric Co., has also intervened in the proceedings in this court.
 
 
 [3]
 The "nuclear fuel cycle" is that chain of activities beginning with mining of uranium ore and extending through final reprocessing and disposal of radioactive wastes by which fuel for a nuclear reactor is processed. Most of these events take place off the individual reactor site, but are necessary to its continued operation
 Although the nuclear fuel cycle encompasses numerous stages, these cases are concerned almost exclusively with the reprocessing and disposal of wastes which the public interest intervenors contend account for by far the largest portion of the environmental impact of the fuel cycle.
 The word disposal may itself be misleading, for it connotes some physical or chemical step which renders the wastes less toxic. Under present technology, the only known agent of detoxification is the passage of great amounts of time. The phase of the nuclear fuel cycle referred to as "disposal" generally refers only to storage of wastes in physical isolation.
 
 
 [4]
 Licensing of commercial nuclear reactors embraces two separate proceedings the first to determine whether the facility should be constructed; the second to determine whether it should be licensed to operate. See generally, Power Reactor Development Co. v. I.U.E.W., 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961)
 Proceedings are conducted before a three-member Atomic Safety and Licensing Board, 42 U.S.C. § 2241, which is the counterpart of an Administrative Law Judge in other agencies. The Licensing Board is typically composed of two nuclear physicists and one lawyer who serves as chairman.
 The Atomic Energy Commission ("AEC") has delegated its review functions over Licensing Board decisions to Atomic Safety and Licensing Appeal Boards, subject to discretionary determination by the AEC itself of "major or novel questions of policy, law or procedure." 10 C.F.R. § 2.785(a); id. (d)(1).
 The AEC was abolished by the Energy Reorganization Act of 1974, 88 Stat. 1233 et seq., and its functions divided between the United States Nuclear Regulatory Commission (NRC), which has been substituted as formal respondent by order of this court, and the Energy Research and Development Agency (ERDA). For consistency, the terminology AEC or "the Commission" is used throughout.
 
 
 [5]
 References to the joint appendix in 74-1385 are in the form "I-J.A." Both volumes of the appendix in 74-1586 are referred to as "II-J.A."
 
 
 [6]
 See infra note 19
 
 
 [7]
 39 Fed.Reg. 14188, 14191 (April 22, 1974), II-J.A. 507, 509. The rule is codified as Part 51.20(e) of 10 C.F.R. (1975) in a section entitled "Applicant's Environmental Report Construction Permit Stage."
 
 
 [8]
 There has been some disagreement between the parties concerning the exact amounts of wastes to be produced. We are required to consider projects from the perspective of their potential effect on the "quality of the human environment." 42 U.S.C. § 4332(2)(C). Since plutonium and other high level wastes may be toxic in extremely small quantities, these variances are not of an order which would affect our conclusions
 
 
 [9]
 See Luschbauch & Langham, A Dermal Lesion from Implanted Plutonium, 86 Archives of Dermatology at 121-24 (Oct. 1962)
 The dangers of plutonium must be kept in perspective. Certain industrial chemicals and substances common in laboratories may be equally toxic. B. Cohen, Environmental Hazards in High-Level Radioactive Waste Disposal, 2 (unpublished). Recent theoretical calculations suggest many would survive even intentional dispersal of plutonium over a city. B. Cohen, The Hazards in Plutonium Dispersal, Institute for Energy Analysis, Oak Ridge, Tenn. (1975). See also Bethe, The Necessity of Fission Power, 234 Scientific American 21, 29 (1976).
 
 
 [10]
 According to a pamphlet published by the AEC's Office of Information to inform the general public, "high-level" wastes consist primarily of highly radioactive spent reactor fuel containing "several hundred to several thousand curies per gallon in liquid form . . . ." Fox, Radioactive Waste, AEC No. IB-508, 14-15 (rev. ed. 1969). They "pose the most severe potential health hazard and the most complex technical problems in management," id., and thus attracted the bulk of the attention in these proceedings
 Less radioactive "low-level" wastes are also produced, primarily when objects such as pipes, rags or other debris are exposed to radioactivity produced in the reactor core. Low-level wastes have long been disposed of in commercial burial grounds and were thought not to constitute a major problem. Recently, however, EPA and GAO have publicly reported radioactive material has been "migrating" from such facilities at a rate "much more rapid than scientists thought possible." See "New Alarms About Old Nuclear Wastes," Business Week (Feb. 2, 1976) at 17; "GAO Reports New Nuclear Garbage Problem," 6 Science & Gov.Rpt. 8 (Feb. 1, 1976).
 
 
 [11]
 The general outlines of the high-level waste disposal problem are undisputed. In Scientists' Institute for Public Information, Inc. v. AEC ("SIPI"), 156 U.S.App.D.C. 395, 481 F.2d 1079, 1098 (1973), this court observed:
 These wastes will pose an admitted hazard to human health for hundreds of years, and will have to be maintained in special repositories. The environmental problems attendant upon processing, transporting and storing these wastes . . . warrant the most searching scrutiny under NEPA. (Emphasis added.)
 
 
 [12]
 I-J.A. 80. We note at the outset that this standard is misleading because the toxic life of the wastes under discussion far exceeds the life of the plant being licensed. The environmental effects to be considered are those flowing from reprocessing and passive storage for the full detoxification period
 It is also misleading to focus solely on the incremental impact of the waste generated by an additional reactor. See NRDC v. Callaway, 524 F.2d 79, 88 (2d Cir. 1975):
 (A)n agency may not . . . treat() a project as an isolated "single-shot" venture in the face of persuasive evidence that it is but one of several substantially similar operations . . . . To ignore the prospective cumulative harm under such circumstances could be to risk ecological disaster.
 See also Kleppe v. Sierra Club, 427 U.S. 390, 408, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) (Comprehensive EIS should address cumulative impact of proposals "pending concurrently"); cf. id. at 414, n. 26, 96 S.Ct. 2718.
 
 
 [13]
 Technical breakthroughs not now foreseen may of course render these assumptions too conservative, and environmental costs may turn out to be less than expected. The alternative is to rest on a blind faith in technological progress. This the draftsmen of NEPA were quite evidently unwilling to do
 Conversely, unforeseen problems sometimes crop up to forestall anticipated technological solutions. See, e. g., infra notes 46 & 47. Where important changes in the state of the art or other major uncertainties are in the offing, meaningful assessments of future environmental impacts might be facilitated by making two alternative estimates: one based only on existing technology and another which takes into account developments which may reasonably be anticipated. We have no occasion in this case to decide whether a court could ever require such a procedure.
 
 
 [14]
 Cf. Calvert Cliffs' Coordinating Comm. v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1128 (1971). There the Commission proposed to forestall consideration of environmental issues in granting reactor construction permits until an operating license was issued. This court pointed out: "Once a facility has been completely constructed, the economic cost of any alteration may be very great. . . . By refusing to consider requirement of alterations until construction is completed, the Commission may effectively foreclose the environmental protection desired by Congress."
 
 
 [15]
 Intervenor Baltimore Gas & Electric Co. contended at argument "however broad NEPA may be, it does not require agencies like the AEC, ICC or CAB to examine in the impact statement the very reason for being of that agency." We have already rejected that argument in Natural Resources Defense Council v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 836 (D.C.Cir. 1972): "The need for continuing review of environmental impact of alternatives under NEPA cannot be put to one side on the ground of past determinations by Congress or the President." See also Calvert Cliffs' Coordinating Comm. v. AEC, supra note 14, 449 F.2d at 1127. One function of NEPA is to provide systematic feedback to Congress and the public on the environmental costs of implementing programs so that they may be re-evaluated in the light of experience
 Moreover, the "reason for being" of the agencies administering the Atomic Energy Act of 1954 has never been unlimited development of civilian nuclear power without regard to the costs or risks. The Congressionally declared purpose is only to "encourage widespread participation in the development and utilization of atomic energy for peaceful purposes to the maximum extent consistent with . . . the health and safety of the public." 42 U.S.C. § 2013(d) (1970) (emphasis added).
 
 
 [16]
 No one suggests that the two sentence statement in the Vermont Yankee Final Environmental Impact Statement is adequate to satisfy § 102(2)(C). It reads:
 Long-lived radioactive materials will be produced by fission of nuclear fuel in the core of the reactor and neutron activation of reactor parts near the core. The eventual disposal and storage of radioactive materials will require a certain amount of space, probably in an area remote from this plant, for a very long period of time, and could for all practical purposes be considered as an irreversible commitment of resources.
 I-J.A. 263.
 No attempt is made to estimate the quantity of wastes produced, describe what precautions must be taken, or assess the costs and risks involved.
 
 
 [17]
 When the final full-power, full-term operating license for the Vermont Yankee Nuclear Power Station was issued, the Appeal Board "declined to re-examine" its earlier holdings that reprocessing and waste disposal issues need not be considered, since the rulemaking proceeding was then pending. I-J.A. 495-96. As a result, the Government argues the only issue raised is "whether the Commission under the National Environmental Policy Act (NEPA) could deal with fuel cycle issues by rulemaking, instead of in the context of numerous separate adjudications, such as the Vermont Yankee licensing proceeding." Respondent's brief at 5
 No one questions the AEC's power to do so in this proceeding. Cf. Union of Concerned Scientists v. AEC, 163 U.S.App.D.C. 64, 499 F.2d 1069 (1974). Nor do we doubt that generic proceedings are a more efficient forum in which to develop these issues without needless repetition and potential for delay. See Ecology Action v. AEC, 492 F.2d 998, 1002 (2d Cir. 1974) (Friendly, J.) (dictum); Note, "The Use of Generic Rulemaking to Resolve Environmental Issues in Nuclear Power Plant Licensing," 61 Va.L.Rev. 869, 878-79 (1975). However, the decision to hold generic proceedings rather than to leave these issues for individual licensings is left to agency discretion. See infra note 27.
 What the agency may not do, consistent with NEPA, is to fail to give these issues adequate consideration in either forum. Thus, until an adequate generic proceeding is held (which may also consolidate a number of pending cases, see, e. g., Specialized Common Carrier Services, 29 F.C.C. 870 (1971)), these issues will be ripe in individual licensing proceedings.
 
 
 [18]
 
 TABLE S-3.--Summary of environmental considerations for uranium fuel cycle
 (Normalized to model LWR annual fuel requirement)
-------------------------------------------------------------------------------
 Natural resource use Total Maximum effect per annual
 fuel requirement of model 1,000
 MWe LWR
-------------------------------------------------------------------------------
Land (acres):
 Temporarily committed 63
 Undisturbed area 45
 Disturbed area 18 Equivalent to 90 MWe coal-
 fired powerplant.
 Permanently committed 4.6
 Overburden moved 2.7 Equivalent to 90 MWe coal-
 (millions of MT) -------- fired powerplant.
Water (millions of
 gallons):
 Discharged to air 156 -2 percent model 1,000 MWe
 LWR with cooling tower.
 Discharged to water 11,040
 bodies
 Discharged to ground 123
 ------------
 Total 11,319 

19 In explaining its decision not to require Table S-3 to be applied retroactively, the Commission stated:
In view of the fact that the environmental effects of the uranium fuel cycle have been shown to be relatively insignificant, the Commission believes that it is unnecessary to apply the (rule) to . . . environmental reports submitted prior to its effective date. . . .
39 Fed.Reg. 14190 (April 22, 1974); II-J.A. 508.
20 37 Fed.Reg. 24192 n.1; id., 24193.
It is conceded that the Environmental Survey was not "intended to be a detailed environmental statement as defined in the National Environmental Policy Act of 1969. . . ." I-J.A. 512; 39 Fed.Reg. 14188 (April 22, 1974), II-J.A. 507.
21 37 Fed.Reg. 24191 (Nov. 15, 1972).
22 It should be noted that members of the presiding hearing board were empowered to ask questions, and occasionally did. In addition, "over 100 pages of handwritten calculations" and prior drafts of the Environmental Survey were eventually placed in the public document room. 39 Fed.Reg. 14190-91 (April 22, 1974).
None of these documents, however, dealt with the crucial waste disposal issues covered by Dr. Pittman, see infra pp. 23-32.
23 See, e. g., Mobil Oil Corp. v. FPC, 157 U.S.App.D.C. 235, 483 F.2d 1238, 1260 (1973); International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 478 F.2d 615, 629-31, 649 (1973); Appalachian Power Co. v. EPA, 477 F.2d 495, 503 (4th Cir. 1973); Walter Holm & Co. v. Hardin, 145 U.S.App.D.C. 347, 449 F.2d 1009, 1016 (1971); American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 359 F.2d 624, 632-33 (en banc), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966).
See also, Williams "Hybrid Rulemaking" under the Administrative Procedure Act: A Legal and Empirical Analysis, 42 U.Chi.L.Rev. 401 (1975); Wright, Court of Appeals Review of Federal Regulatory Agency Rulemaking, 26 Admin.L.Rev. 199 (1974); Wright, the Courts and the Rulemaking Process: The Limits of Judicial Review, 59 Cornell L.Rev. 375 (1974). Verkuil, Judicial Review of Informal Rulemaking, 60 Va.L.Rev. 185, 234-49 (1974); Note, The Judicial Role in Defining Procedural Requirements for Agency Rulemaking, 87 Harv.L.Rev. 782 (1974); Hamilton, Procedures for the Adoption of Rules of General Applicability: The Need for Procedural Innovation in Administrative Rulemaking, 60 Calif.L.Rev. 1276, 1313-30 (1972); Claggett, Informal Action Adjudication Rulemaking: Some Recent Developments in Federal Administrative Law, 1971 Duke L.J. 51, 78.
24 Respondent's brief at 13-14.
25 We disagree with Intervenor Baltimore Gas & Electric Co.'s threshold objection that the public interest intervenors failed to make a proffer of the specific issues and witnesses which they claimed could not adequately be explored without cross-examination as required by International Harvester Co. v. Ruckelshaus, supra note 23, 478 F.2d at 630-31; see also American Airlines v. CAB, supra note 23, 359 F.2d at 632-33. The public-interest intervenors submitted a thorough legal brief demanding cross-examination and discovery rights. CNI-UCS Statement with Respect to Legal Considerations of the Proposed Regulations on the Nuclear Fuel Cycle, 20-29; II-J.A. 225, 245, 254. The first point made by Mr. Roisman, attorney for the public interest intervenors, in the oral hearings was a request to be allowed to go behind the reassurances offered by Dr. Pittman:
The Atomic Energy Commission continues to take subjects as important as nuclear waste disposal and treat them in a cavalier manner that we find them treated in this environmental survey. They continue to raise the issues of the environmental (sic) fuel cycle in the most obtuse manner, and subject it to this type of a legislative hearing, while refusing to face up to the fact that the public demands the right to cross-examine and to have discovery on these issues, that we are not satisfied with Mr. Pittman's well intentioned, but, we think, not at all well explained position with regard to the ability to handle nuclear wastes for hundreds of thousands of years. He has in his own words referred to it as a program of perpetual management. . . . I think the public deserves the right to ask the question, What does that mean?
II-J.A. 121-22. That was sufficient to focus the agency's attention on Dr. Pittman's testimony as in the category of " 'soft' and sensitive subjects and witnesses." International Harvester, supra, 478 F.2d at 631. See infra, pp. --- of 178 U.S.App.D.C., 650 of 547 F.2d.
To be sure, the public interest intervenors did not show that these issues could not be explored except through cross-examination; nor did they attempt such a showing. Their argument, as we understand it, is not that cross-examination was required per se, but that the procedures utilized by the Commission were in the aggregate inadequate sufficiently to ventilate the issues. They recognize, for example, that exploration of the underlying methodology of the Environmental Survey could have been facilitated by adequate discovery, as an alternative to cross-examination of the staff. See Petitioner's Brief, 13-15.
26 The Supreme Court has recently cautioned against requiring an agency to use particular procedures on remand:
At least in the absence of substantial justification for doing otherwise, a reviewing court may not, after determining that additional evidence is requisite for adequate review, proceed by dictating to the agency the methods, procedures, and time dimension of the needed inquiry and ordering the results to be reported to the court without opportunity for further consideration on the basis of the new evidence by the agency.
FPC v. Transcontinental Gas Pipe Line Corp., 423 U.S. 326, 96 S.Ct. 579, 583, 46 L.Ed.2d 533 (1976) (per curiam) (footnote omitted).
27 See NLRB v. Bell Aerospace Co., 416 U.S. 267, 292-95, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); SEC v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) (Chenery II); Siegel v. AEC, 130 U.S.App.D.C. 307, 400 F.2d 778, 783 (1968).
28 That may be reflected in the finding that in most cases where the right to cross-examination was won on appeal, it was not actually used on remand, the parties instead agreeing on more flexible procedures such as written memoranda explaining technical methodology or informal staff conferences which better suited their needs. See Williams, supra note 23, 42 U.Chi.L.Rev. at 436-37; 448-54.
29 See, e. g., International Harvester v. Ruckelshaus, supra note 23, 478 F.2d at 631 (" 'soft' and sensitive subjects and witnesses"); but cf. O'Donnell v. Shaffer, 160 U.S.App.D.C. 266, 491 F.2d 59, 62 (1974) (Bazelon, C. J.): "the presence of technical issues in and of itself (does not) create a need for cross-examination."
30 See, e. g., Walter Holm & Co. v. Hardin, supra note 23, 449 F.2d at 1016: "What counts is the reality of an opportunity to submit an effective presentation, to assure that the Secretary and his assistants will take a hard look at the problems in light of those submissions."; International Harvester v. Ruckelshaus, supra note 23, 478 F.2d at 631: "There was a meaningful opportunity to be heard. . . . The record reveals that the hearing officers did not propound the pre-submitted questions like robots; they were charged with conducting a hearing for the purpose of focusing information needed for decision, and they quite appropriately 'followed up' on questions."; O'Donnell v. Shaffer, supra note 29, 491 F.2d at 62: "Here the agency's proceedings provided an adequate opportunity for the airing of technical disputes. Appellants presented their evidence orally and in writing and questioned a supporter of the rule who testified at the hearing. The agency considered the evidence presented at the hearing in its 'Disposition of Petition.' On these facts, the procedures were adequate for the task at hand."; Ethyl Corp. v. EPA, 176 U.S.App.D.C. 373, 425, 541 F.2d 1, 53 (1976) (en banc) (opinion of Wright, J.), cert. denied, --- U.S. 941, 96 S.Ct. 2663, 48 L.Ed.2d 426 (1976), reviewing in detail the procedures used and the agency's lengthy opinion and concluding: "The complex scientific questions presented by this rulemaking proceeding were 'resolved in the crucible of debate through the clash of informed but opposing scientific and technological viewpoints.' " (Citation omitted.)
31 See Wright, supra note 23, 26 Admin.L.Rev. at 206-7; id., 59 Cornell L.Rev. at 387-88.
Judge Tamm professes surprise that one who believes judges must avoid making "plausible-sounding, but simplistic, judgments of the relative weight to be afforded various pieces of technical data," Ethyl Corp. v. EPA, supra note 30 (Bazelon, C. J., concurring), 176 U.S.App.D.C. at 438, 541 F.2d at 66, nonetheless believes review of agency procedures requires conscientious attention to the state of the record. Concur, n.7.
There is, however, a difference crucial to the institutional competency of judges between the majority opinion here and the panel opinion, joined by Judge Tamm, which was overturned by the court en banc in Ethyl. The panel in Ethyl took it upon itself to decide that an expert agency had made "clear errors of judgment" in evaluating conflicting scientific studies. 176 U.S.App.D.C. at 420, 541 F.2d at 48. Here we merely systematically catalog the state of the record to verify that the agency has digested and addressed the major issues.
32 See International Harvester v. Ruckelshaus, supra note 23, 478 F.2d at 631.
33 Kennecott Copper Corp. v. EPA, 149 U.S.App.D.C. 231, 235, 462 F.2d 846, 850 (1972).
34 At least in the NEPA context, an agency has an affirmative obligation to explore the issues in depth, rather than wait passively until an intervenor takes the initiative. See Calvert Cliffs' Coordinating Comm. v. AEC, supra note 14, 449 F.2d at 1118-19. There the Commission proposed to limit consideration to environmental issues "which parties affirmatively raise." The court held that was inconsistent with NEPA's "basic mandate":
The primary responsibility for fulfilling that mandate lies with the Commission. Its responsibility is not simply to sit back, like an umpire, and resolve adversary contentions at the hearing stage. Rather, it must take the initiative . . . .
See also Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608, 620-21 (2d Cir. 1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966) (agency duty to develop full record grounded on broad principles of administrative law); Note, supra note 17, 61 Va.L.Rev. at 891: "when the record is deficient, the Commission may even have a duty to consider issues ignored by the parties."
In both Calvert Cliffs and Scenic Hudson, the court pointed out that poorly-financed public interest intervenors may lack the wherewithal to marshal technical evidence and bring it to the Commission's attention. See also American Public Power Ass'n v. FPC, 173 U.S.App.D.C. 36-41, 522 F.2d 142, 147 (1975) (Bazelon, C. J., concurring); Citizens for Safe Power v. NRC, 173 U.S.App.D.C. 317-330, 524 F.2d 1291, 1304 (1975) (Bazelon, C. J., concurring).
35 Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). Cf. Ethyl Corp. v. EPA, supra note 30 (Bazelon, C. J., concurring), 176 U.S.App.D.C. 438 n.7, 541 F.2d 66.
36 Wright, supra note 23, 26 Admin.L.Rev. at 206.
37 See Portland Cement Ass'n v. Ruckelshaus, 158 U.S.App.D.C. 308, 486 F.2d 375, 393-95 (1973), cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); cf. Automotive Parts & Accessories Ass'n v. Boyd, 132 U.S.App.D.C. 200, 407 F.2d 330, 338 (1968) (statement of basis and purpose must be explicit enough to allow court "to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did").
38 Portland Cement Ass'n v. Ruckelshaus, supra note 37, 486 F.2d at 393-94.
39 See Wright, supra note 23, 26 Admin.L.Rev. at 209-210.
40 See supra note 19.
41 In a general way, "reprocessing" is that phase of the fuel cycle in which reusable portions of spent fuel are extracted for recycling and the remaining radioactive residues are concentrated. "Waste disposal," a misnomer for what is more appropriately termed "waste storage and management," refers to containment of wastes during the long periods necessary for them to decay naturally into non-toxic substances. See supra note 3.
42 See "Environmental Survey of the Uranium Fuel Cycle" (April, 1974) (hereafter "Revised Environmental Survey") G-23 n.18, II-J.A. 740.
For example, the discussion of the possibility of accidental release of wastes as a result of loss of coolant at id., G-19-21, II-J.A. 736-737, is taken verbatim from Dr. Pittman's statement.
43 II-J.A. 59. In Portland Cement Ass'n v. Ruckelshaus, supra note 37, 486 F.2d at 400 n.95, the court pointed out that where a "principal source of reliance by the agency" was "peculiarly subject to considerations of self-interest, more might be required than mere comments." Evaluation of a program by the in-house staff member charged with the responsibility for administering it falls within the intendment of that statement.
44 The staff subsequently described the significance of Dr. Pittman's testimony as follows:
When the (Environmental Survey) was published in November 1972, the data on the proposed Federal Repository for high level waste storage were limited to preliminary criteria and generalized statements. . . . The information in Dr. Pittman's statement is the first public release of the preliminary concepts for the Federal Repository and provides a summary of the current status and potential environmental effects of the high level waste interim storage facility and further AEC plans for longer term storage. The information from his testimony will be incorporated in the revised edition of the (Environmental Survey). . . . The additional data presented by Dr. Pittman show that the interim high-level waste repository will be designed to have little environmental impact.
"Additional Information on Environmental Effects of the Uranium Fuel Cycle," II-J.A. 355-56.
45 See Revised Environmental Survey, G-7, II-J.A. 724.
46 The difficulties encountered regarding the primary site considered, salt beds near Lyons, Kansas, have recently been summarized as follows:
Although that site had been under consideration for many years by the (AEC), it was not until 1971 that the commission and its contractors discovered two major problems with it. One was a series of abandoned gas and oil drill holes in the area. Another was an adjacent salt mine's extensive use of water to dissolve out the salt including a hydraulic fracturing technique which had resulted in the disappearance underground of some 175,000 gallons of water. Both discoveries cast doubt on the long-term safety and integrity of the proposed Lyons site, since it appeared possible that water might penetrate the area and allow radioactive wastes to escape.
Boffey, "Radioactive Waste Site Search Gets Into Deep Water," 190 Science 361 (Oct. 24, 1975).
After the planned site near Lyons, Kansas was abandoned, attention focused on salt beds in southeastern New Mexico. Unexpected problems have recently been encountered at this site, too. A test hole hit a large underground pocket of brine and explosive gases. Not only would the presence of these gases threaten the safety of workers at any facility, but a "second disturbing aspect is that the presence of the brine solution may indicate that fluids have been migrating underground, thereby threatening the integrity of the site." Id. As the result, the search for a suitable site has been moved once again, this time to an area several miles away.
47 By letter dated April 9, 1975, the Administrator of ERDA informed the Congressional Joint Committee on Atomic Energy that preliminary funding for a Retrievable Surface Storage Facility was being deleted from the fiscal 1976 budget request pending a "comprehensive reevaluation of the federal program in this critical and controversial area." See "ERDA Shelves a Nuclear Waste Storage Plan," 188 Science 345 (April 25, 1975).
As part of that review, we understand revised impact statements are being prepared concerning reprocessing and waste disposal. As those matters are not before us, we intimate no opinion regarding the extent to which they may cure the deficiencies in the present proceeding.
Recent Congressional testimony by ERDA officials indicates a return to the plan to bury wastes, although no site has been finally chosen. "Salt, Rock Formations Favored for A-Wastes," Washington Post, May 11, 1976, A-2, cols. 1-3.
48 Following Dr. Pittman's presentation one of the presiding board members remarked:
. . . one of the, I think, outstanding practices of the Staff has been in the past, at least as far as I can tell, to meticulously document the assumptions that are made in the discussions. I find that that has not been done here. . . . I guess I must assume that one of the reasons that those assumptions have not been documented and clarified or justified in the purest sense of the word, is because of the time schedule required to get this thing on so we could get to hearings. Can it be assumed that if there is going to be a significant revision to this document that in those areas where assumptions are made, particularly where there is a statement to the effect that something is trivial, or insignificant, that somewhere there will appear in that same document some kind of justification based on data or a reference which one can go back to and find the source.
II-J.A. 116-17.
A staff member assured the questioner "(w)e will make every effort to go back and see if we can improve that," II-J.A. 118, and subsequently the staff submitted a 56 page document of "Additional Information on Environmental Effects of the Uranium Fuel Cycle," II-J.A. 352. However, less than two pages are devoted to the waste disposal issues addressed by Dr. Pittman, and these merely correct four minor numerical and typographical errors or omissions in his testimony. See II-J.A. 402-03. Nor does the Revised Environmental Survey fill in the gaps in Dr. Pittman's testimony.
49 See "Environmental Survey of the Uranium Fuel Cycle" (April, 1974) G-19-20, II-J.A. 736-737.
50 When Dr. Henry Kendall, an expert witness for Consolidated National Intervenors, tried to raise the risks of terrorism, he met the following reception from the chairman of the hearing board:
I have just one question . . . with regard to nuclear blackmail and the potential terrorist activities. What I am a little puzzled about is its relevance . . .. I say this with all due respect, Dr. Kendall; I guess those words are exciting reading in the newspapers, but I would like to have (you) indicate the relevance between the responsibilities of the Atomic Energy Commission under the National Environmental Protection Act (sic) in these respects as against, at least, what I read to be the subject matter of your comments in this particular wise, and that is the military and potential security aspects of the transportation of nuclear materials. Do I make myself clear?
An attorney for the intervenors then explained that NEPA requires consideration of more than the "simplistic questions" of "how many fish will get hurt. . . ." The chairman responded:
You see then, forgive me for using the word, a fusion somehow between what is known as, I understand, the impact on the environment as against the political and military security?
(Attorney):
Of course, what is precisely involved in political and military security is that someone threatens to do a heck of a lot of damage to the environment in exchange for something they want.
II-J.A. 213-16.
51 A subsequent report to the Administrator of ERDA by a four-man task force, including Dr. Pittman, reflects a much less rosy assessment of the problems of reprocessing and waste disposal. Nuclear Fuel Cycle: A Report of the Fuel Cycle Task Force, ERDA-33 (March, 1975).
The unanimous task force concluded, inter alia, "there are still many technical problems and uncertainties in the overall area of processing of spent fuel and properly managing its radioactive waste", id., 40; "(t)he costs of storage and ultimate disposal . . . are very much higher than had previously been assumed . . .", id., 46; "(the public) fear(s) that the radioactive waste generated . . . will either be neglected, and thus place an unacceptable hazard potential on mankind, or be managed in a way that will place an unacceptable burden on future generations to assure continued public safety. (T)hese . . . fears . . . are supported by a fair segment of the scientific community many of whom otherwise support the use of nuclear reactors for generation of electric power", id., 49-50.
52 See supra note 46. Contrary to Dr. Pittman's unexplained optimism, an article in Science recently termed finding a site for long-term disposal of radioactive wastes "one of the key unresolved problems of the nuclear era." Boffey, supra note 46, 190 Science 361 (Oct. 24, 1975).
53 Revised Environmental Survey, supra note 42, G-2-G-3, II-J.A. 719-720.
54 II-J.A. 275-76. An illuminating perspective is provided in D. Farney, Ominous Problem: What to Do with Radioactive Waste, 5 Smithsonian Mag. 20, (1974):
The entire recorded history of mankind is but a fraction of the 250,000-year storage time of plutonium. Neanderthal man appeared only about 75,000 years ago.
55 The presiding board wrote:
At the time the Environmental Survey was issued for public comment in the Rulemaking Proceeding, together with the proposed amendments to the Rules, the Survey did not contain data with regard to proposed waste disposal systems. During the course of the oral presentation, the Regulatory Staff offered for the record an extensive presentation by Dr. Frank Pittman regarding various methods for waste disposal which were in the planning stage, and, based upon such planning, assigned various values regarding assumed environmental impact of such waste storage facilities. It was argued that, in all other respects, the Survey dealt with the environmental impact of actual and existing facilities; but that with respect to waste disposal, the Survey was unreliable in that it dealt with non-existent facilities; . . . .
II-J.A. 490.
While this is not an entirely accurate synopsis of the intervenor's position as set out above, it focused the Commission's attention on this aspect of the proceedings.
56 We note that the Commission also promised to undertake "a more definitive assessment" of the environmental effects of waste storage as more information becomes available through subsequent environmental impact statements. 39 Fed.Reg. 14190 (April 22, 1974); II-J.A. 508.
While that is praiseworthy as an acknowledgment of the Commission's responsibility to reassess its actions in the light of later information, it cannot be used as a bootstrap to excuse the present rule cutting off further consideration in licensing proceedings.
We have already held in Vermont Yankee, supra p. --- of 178 U.S.App.D.C., 639 of 547 F.2d, that the Commission may not refuse to consider the environmental effects of waste disposal when it licenses an individual reactor simply by promising to consider them later when it licenses facilities for waste disposal. We see no reason why that principle applies with any less force to accomplishing the same result through rulemaking.
57 We reject the contention that Table S-3 is itself a "major Federal action" requiring an environmental impact statement. The Commission characterized this rulemaking as merely addressing "a procedural question involving the implementation of NEPA . . . ." 39 Fed.Reg. 14188. Cf. Gage v. AEC, 156 U.S.App.D.C. 231, 479 F.2d 1214, 1222 n. 26 (1973). Petitioners, however, claim Table S-3 has "substantive" effect, since it establishes values for environmental effects on which subsequent licensing decisions may turn. Reply brief at 12. While we agree that Table S-3 may have important decisional consequences by implying that fuel cycle problems are manageable, in the circumstances presented here, we do not believe these implications ripen into a proposal for agency action until they are incorporated into individual licensing decision. Compare Aberdeen & Rockfish R.R. v. SCRAP, 422 U.S. 289, 320, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975) with SIPI, supra note 11, and Sierra Club v. Morton, 169 U.S.App.D.C. 20, 514 F.2d 856 (1975), rev'd sub nom. Kleppe v. Sierra Club, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). At that point an impact statement will be prepared with regard to the licensing decision. We do not read the statute as requiring more.
Petitioners also argue that Table S-3 violates NEPA because it is incomprehensible to "non-technical minds." Environmental Defense Fund v. Corp of Engineers, 348 F.Supp. 916, 933 (W.D.Miss.), aff'd., 492 F.2d 1123 (5th Cir. 1972). We do not reach that issue. The defects, if any, may be cured by fuller explanation in a revised statement of basis and purpose, or in subsequent NEPA statements incorporating Table S-3.
Finally, we reject the related argument that plenary consideration of alternatives was necessary in this proceeding. We agree with the Commission that this may be deferred until action is proposed to license particular disposal facilities. For purposes of this proceeding, provided a sufficiently conservative and credible assessment of a particular waste disposal method is used, it is not material that another method might turn out to be even more desirable. See supra note 13. Of course, we do not exclude the possibility that limited consideration of certain alternatives (e. g., the consequences of not proceeding at all) may be necessary to meaningful judgments in a proceeding such as the present.
58 Agencies are always free to adopt "hybrid procedures" beyond the minima prescribed by 5 U.S.C. § 553, and commonly do. United States v. Florida East Coast Ry., 410 U.S. 224, 236 n. 10, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973). In this case, the Commission elected to provide certain hybrid procedures in addition to those required by § 553 oral hearings and questioning by a presiding board. By listing other techniques, supra p. --- of 178 U.S.App.D.C., 653-654 of 547 F.2d, which might aid the Commission in compiling an adequate record, we do not intimate that it must adopt any of them. What is of concern to us is that the record after remand disclose a thorough ventilation of the issues.
On paper, the procedures used to supplement § 553 here were virtually identical to those approved by the court in International Harvester v. Ruckelshaus, supra note 23, 478 F.2d at 631, in which oral statements were allowed and the hearing board was authorized to ask questions submitted by the parties. However, in practice the procedures were administered quite differently in International Harvester : "(T)he hearing officers did not propound the pre-submitted questions like robots; they were charged with conducting a hearing for the purpose of focusing information needed for decision, and they quite appropriately 'followed up' on questions." Id.
59 Concur at ---- of 178 U.S.App.D.C., 660 of 547 F.2d. According to Judge Tamm, on remand "the Commission may or may not adopt one of the majority's (procedural) suggestions, but will in any case seek to comply by mechanically generating more 'negative' information respecting current problems with disposal of high level radioactive wastes and then will 'overcome' this information with citations to favorable studies and articles." Id. ---- of 178 U.S.App.D.C., 659-660 of 547 F.2d.
Stripped of rhetoric, this means that the Commission may reach the same result on an adequate record which, of course, is why we remand rather than reverse.
60 See Calvert Cliffs' Coordinating Comm. v. AEC, supra note 14, 449 F.2d at 1115. See also, Comm. for Nuclear Responsibility, Inc. v. Seaborg, supra, 463 F.2d at 787; NRDC v. Morton, supra note 15, 458 F.2d at 833.
61 Evidently Judge Tamm would permit Dr. Pittman to supplement his testimony without giving those who disagree an opportunity to criticize or comment on the new material (e. g., "without reopening the oral proceeding," Concur at ---- of 178 U.S.App.D.C., 659 of 547 F.2d). We would not agree.
Unlike explanation of the Commission's rationale, Dr. Pittman's testimony is part of the evidentiary support underlying the proposed rule. Cf. Concur at ---- of 178 U.S.App.D.C., 661 of 547 F.2d. Both rudimentary procedural fairness and § 553 require that the evidentiary "basis" for a proposed rule be subject to public scrutiny and comment. See Portland Cement Ass'n v. Ruckelshaus, supra note 37, 486 F.2d at 393 n. 67; Mobil Oil Corp. v. FPC, supra note 23, 483 F.2d at 1251 n. 39. This variant of the traditional adversary process permits other experts, and the public, to bring to bear the purifying effect of their comments.
At least where the existing record is inadequate to sustain a rule, an agency cannot buttress its case with additional data not subject to public comment. "If a particular rule rests on an extensive analysis of data or a complex prediction . . . the agency should not rely on any research methods or data which were not presented to the interested parties for comment or criticism." Wright, supra note 23, 59 Cornell L.Rev. at 383, n. 34 (1974).
62 See, e. g., Remarks by USNRC Commissioner Edward A. Mason at MIT (March 4, 1976) quoted Science & Gov.Rpt., 4 (April 1, 1976):
So the biggest problem impeding the contribution of nuclear power in meeting the nation's energy needs seems to me to be the lack of informed public understanding. . . .
Edward Teller, "Nuclear Salvation," Newsweek (May 17, 1976) at 15:
Indeed, there is no better subject with which to scare people than nuclear energy. What is new, what is not completely understood, is always frightening. But nuclear energy is a special case. It comes from a remote part of research that, in the minds of many people, borders on science fiction. It was developed in wartime and shrouded in secrecy. It came to the attention of mankind when, in two strokes, more than 100,000 people were killed in the final days of a terrible war. . . . Can we, in our democratic society, overcome unreasonable fears?
63 Thomas Jefferson, Letter to William Charles Jarvis (Sept. 28, 1820).
64 We are aware of suggestions that where agency action is based on an inadequate record, the appropriate remedy may be to remand for supplementation rather than a declaration that the rule or order is invalid. See Leventhal, Environmental Decisionmaking and the Role of the Courts, 122 U.Pa.L.Rev. 509, 539 (1974). But cf. Camp v. Pitts, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973): If the decision of the agency "is not sustainable on the administrative record made, then the . . . decision must be vacated and the matter remanded . . . for further consideration." quoted F. P. C. v. Transcontinental Gas Pipe Line Corp., supra note 26, 96 S.Ct. at 582 (emphasis added).
1 The concurrence relies on Wright, The Courts and the Rulemaking Process: The Limits of Judicial Review, 59 Cornell L.Rev. 375 (1974), which explicitly assumes an idealized model differentiating sharply between "policy-type rules or standards, on the one hand, and proceedings designed to adjudicate particular cases on the other." Id., 386. This model posits that accurately determining facts is relatively unimportant in rulemaking because the "ultimate shape of the rule seldom 'follows from the facts.' " Id., 379 n. 15. Based on this conceptual distinction, drawn from Bi-Metallic Investment Co. v. State Bd. of Equalization, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915), it is argued "An adjudication is fair to the individual only if the facts are accurately found. . . . (I)n the rulemaking context, fairness is not identified with accuracy, and procedures designed to maximize accuracy at the cost of all other values are simply inappropriate." Id., 379.
With all due respect, this assumes away the hybrid rulemaking problem which arises primarily when rulemaking procedures are used in contexts where accurate fact-finding is of high relative importance. See infra p. ---- of 178 U.S.App.D.C., and n. 3, 656 of 547 F.2d.
2 See, e. g., United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972); United States v. Florida East Coast Ry., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973) (ratemaking).
3 The development of scientific or technical standards is a prime example. These decisions may involve both assessing scientific evidence, and also a "legislative" or policy component as to what level of risk is "safe," and how uncertainties are to be valued. See Handler, A Rebuttal: The Need for a Sufficient Scientific Base for Governmental Regulation, 43 Geo.Wash.L.Rev. 808, 809 (1975).
The relative centrality of the fact-finding and policy-making components may vary depending on the precise regulatory scheme and the state of knowledge. Compare Ethyl Corp. v. EPA, 176 U.S.App.D.C. 373, 541 F.2d 1, No. 73-2205 (1976) (en banc) (legislative policy decision) with Portland Cement Ass'n v. Ruckelshaus, 158 U.S.App.D.C. 308, 486 F.2d 375, 390-402 (1973), cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974).
The present proceeding was devoted almost entirely to technical fact-finding. The Commission characterized its purpose as data-gathering, rather than an analysis of alternatives or costs and benefits, 39 Fed.Reg. 14188, and specifically disclaimed that the values arrived at represented "safe" operating limits. Id., 14190. This was simply not, as Judge Tamm states, a proceeding to arrive at an "administrative weighing of risks and benefits of additional reactors," Concur at ---- of 178 U.S.App.D.C., 661 of 547 F.2d or to decide "whether licensing an additional reactor is worth the additional environmental risk . . . ." Concur at ---- of 178 U.S.App.D.C., 660 of 547 F.2d.
4 See 2 Davis, Administrative Law Treatise § 15.03 (1958):
When a court or an agency finds facts concerning the immediate parties who did what, where, when, how, and with what motive or intent the court or agency is performing an adjudicative function, and the facts are conveniently called adjudicative facts. . . .
Stated in other terms, the adjudicative facts are those to which the law is applied in the process of adjudication. They are the facts that normally go to the jury in a jury case. They relate to the parties, their activities, their properties, their businesses. Legislative facts are the facts which help the tribunal determine the content of law and of policy and help the tribunal to exercise its judgment or discretion in determining what course of action to take. Legislative facts are ordinarily general and do not concern the immediate parties.
5 Judge Tamm raises the specter that the "entirely predictable" response by administrators to "procedural refinements" will be so many adjudicatory procedures that "the advantages of informal rulemaking as an administrative tool are lost in a heap of judicially imposed procedure." Concur at ---- of 178 U.S.App.D.C., 660 of 547 F.2d. Adjudicatory forms are no talisman which would guarantee an agency an adequate record.
Moreover, Williams, "Hybrid Rulemaking" Under the Administrative Procedure Act: A Legal and Empirical Analysis, 42 U.Chi.L.Rev. 401 (1975), points out that the hybrid rulemaking cases have not in fact had that kind of impact on agency behavior. Id., 425, 428, 448. Contrary to Judge Tamm's statement that cross-examination afforded only delay and something to be traded off for "substantative concessions," Concur at n. 6, Williams actually discovered that the parties were able to agree on procedural innovations which better met their needs and were less time-consuming than cross-examination. See Majority Op., supra note 28.
6 Environmental Defense Fund, Inc. v. Ruckelshaus, 142 U.S.App.D.C. 74, 439 F.2d 584, 598 (1971) (Bazelon, C. J.). See also Leventhal, Environmental Decisionmaking and the Role of the Courts, 122 U.Pa.L.Rev. 509, 512-13 (1974).
7 In discussing the article by Judge Wright, supra note 2, on which the concurrence relies, Judge Friendly writes:
A judge not in the arena must wonder whether the war Judge Wright is waging with his colleagues is not in some degree semantic. . . . One can hardly quarrel with the conclusion that if a reviewing court finds that the procedures followed by the agency in adopting a rule have not produced a body of evidence enabling it to pronounce the required benediction, the court must remand. . . . It is thus not too consequential whether a court invalidates a rule on the ground that the procedures have not developed substantial evidence to support it or even evidence adequate to rebut a claim that it is arbitrary and capricious, or, instead, takes the route of prescribing ad hoc procedural requirements in addition to those of section 553. . . . Both roads lead to the conclusion that an administrator engaged in rulemaking governed by the APA cannot always be sure that rudimentary notice and comment procedures, even if they measure up to Judge Wright's salutary specifications, will always suffice.
Friendly, Some Kind of Hearing, 123 U.Pa.L.Rev. 1267, 1313-14 (1975) (footnotes omitted).
8 The logic of Judge Tamm's position that the "deficiency" here is not with the procedures used to make a record, just with the "record generated," Concur at ---- of 178 U.S.App.D.C., 659 of 547 F.2d, totally escapes me.
Judge Tamm also criticizes the court for failing to tell the Commission "in precise terms" how to achieve a "thorough ventilation" of the factual issues. Concur at ---- of 178 U.S.App.D.C., 659 of 547 F.2d. He apparently finds greater specificity in an instruction to the Commission to provide "an explanation of the basis" of its conclusions. Concur at ---- of 178 U.S.App.D.C., 660-661 of 547 F.2d.
9 Cf. Lathan v. Brinegar, 506 F.2d 677, 693 (9th Cir. 1974) (en banc):
We think that the courts will better perform their necessarily limited role in enforcing NEPA if they apply (the "without observance of procedure required by law" standard of 5 U.S.C.) § 706(2)(D) in reviewing environmental impact statements for compliance with NEPA than if thy (sic) confine themselves within the straight jacket of (the "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard of 5 U.S.C.) § 706(2)(A).
See also Ohio v. Wyandotte Chem. Corp., 401 U.S. 493, 504, 91 S.Ct. 1005, 1012, 28 L.Ed.2d 256 (1971) (original jurisdiction declined in pollution case involving complex, novel and technical factual questions):
. . . Ohio is raising factual questions that are essentially ones of first impression to the scientists. The notion that appellate judges, even with the assistance of a most competent Special Master, might appropriately undertake at this time to unravel these complexities is, to say the least, unrealistic. Nor would it suffice to impose on Ohio an unusually high standard of proof. That . . . would not lessen the complexity of the task of preparing responsibly to exercise our judgment, or the serious drain on the resources of this Court it would entail.
1 A major purpose of NEPA was to avoid the limiting effect of incremental decisionmaking by confronting environmental problems before foreclosing alternative methods of dealing with them. See S.Rep.No.296, 91st Cong., 1st Sess. 5 (1969), quoted in Majority, supra at 178 U.S.App.D.C. ----, 547 F.2d 639. To this end, NEPA requires a thorough cost-benefit study in each case before undertaking major federal action affecting the quality of the human environment. Calvert Cliffs' Coordinating Comm. v. AEC, supra at 1128.
2 The standard of review under section 553 has been the subject of considerably discussion in recent years, especially within this judicial circuit. See, e. g., the cases and articles cited in Majority, supra note 23.
3 Section 553 imposes only three obligations on the rulemaker. First the rulemaker must give adequate and effective notice of "either the terms or substance of the proposed rule or a description of the subjects and issues involved." Secondly, he must "give interested persons an opportunity to participate . . . through submission of written data, views, or arguments with or without opportunity for oral presentation." Finally, the rulemaker must "incorporate in the rules adopted a concise and general statement of their basis and purpose." 5 U.S.C. § 553 (1970). See generally Verkuil, Judicial Review of Informal Rulemaking, 60 Va.L.Rev. 185 (1974).
The "concise and general statement" required by section 553 must be sufficiently complete and detailed to enable the court to accomplish its reviewing function, assuring itself that the agency has engaged in reasoned decisionmaking, has given serious thought to alternative rulings, and has provided reasoned explanations for controversial normative and empirical determinations. In short, "the reviewing court must satisfy itself that the requisite dialogue occurred and that it was not a sham." Wright, The Courts and the Rulemaking Process: The Limits of Judicial Review, 59 Cornell L.Rev. 375, 381 (1974).
4 The majority also recognizes that the procedures utilized by the Commission might suffice "if administered in a more sensitive, deliberate manner." Majority, supra at 178 U.S.App.D.C. ----, 547 F.2d 653.
5 See Environmental Defense Fund, Inc. v. Corps of Engineers, 470 F.2d 289 (8th Cir.), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1972), in which the Eighth Circuit Court of Appeals held that, although NEPA requires agencies to evaluate objectively their projects, it does not require agency officials to be subjectively impartial. In other words,
NEPA assumes as inevitable an institutional bias within an agency . . . and erects the procedural requirements of § 102 to insure that there is no way the decision-maker can fail to note the facts and understand the various arguments advanced by the plaintiffs if he carefully reviews the entire environmental impact statement.
Id. at 295 (quotation marks and citation omitted).
6 Judicial imposition of procedural requirements on an ad hoc basis is criticized in Wright, supra.
7 It has been argued that those cases in which we have granted a limited right of cross-examination on remand have afforded little relief other than delay and a tool with which to bargain for substantive concessions. Williams, "Hybrid Rulemaking" Under the Administrative Procedure Act: A Legal and Empirical Analysis, 42 U.Chi.L.Rev. 401, 436-48. It would seem, therefore, that the right of cross-examination at a rulemaking proceeding frequently is better to have and be denied than to utilize.
8 A further problem with over-reliance on the hybrid rulemaking approach has its roots in the hostility of some judges to all forms of substantive review of agency decisions. The line between substantive and procedural review is, of course, a hazy one. The same judges who most vehemently protest against judicial intrusions into the substance of administrative action, especially in highly technical areas, may not hesitate to require relatively more procedure of an agency when they dislike its substantive result. There is, I believe, a danger that judges will feel less restrained in requiring agencies to adopt procedures in excess of those required by the APA when review is couched in procedural, rather than substantive, terms. The preoccupation of the majority opinion in this case with the half-life of the plutonium atom and the myriad of geological and other technical difficulties one faces in attempting to safely store a highly toxic substance for a quarter of a million years demonstrates that judges cannot avoid the task of immersing themselves in difficult and often technical matters in order to evaluate administrative action and assure themselves that the agency has in fact dealt with all major issues. Because the relative environmental importance of the waste disposal issue before us is the subject of some controversy, arguments about whether our focus here is "procedural" or "substantive" may be more semantic than determinative.
9 See the cases cited at note 23 of the majority opinion.
10 As the majority states, due process considerations probably mandate that petitioners be allowed to comment upon any additional information assembled by the Commission. Neither the Constitution nor the Administrative Procedure Act, however, directs the Commission to allow additional oral presentation, cross-examination, or any other procedures in addition to those required by section 553.
11 The extent of the required statement of basis may vary, of course, according to the precise demands and issues of each particular case, but, "(a) t a minimum, the statement should refer to relevant submissions by interested parties and should rebut or accept these submissions in an orderly fashion." Wright, supra at 381. This court has also distinguished between factual determinations and policy choices more peculiarly within the expertise of the administrative agency. In the former case, we commonly have insisted upon sufficient attention to the facts to enable the reviewing court to ascertain the underlying rationality of the resultant regulations. Amoco Oil Co. v. Environmental Protection Agency, 501 F.2d 722, 163 U.S.App.D.C. 162 (1974). In contrast,
(w)here . . . the regulations turn on choices of policy, on an assessment of risks, or on predictions dealing with matters on the frontiers of scientific knowledge, we will demand adequate reasons and explanations, but not "findings" of the sort familiar from the world of adjudication.
Id. at 741.
Often, of course, an agency ruling will encompass both factual determinations and policy choices. This is such a case. For example, the decision to treat the waste storage issue through generic rulemaking because it is common to all licensing decisions is clearly a policy determination within the agency's special expertise which we should review only for clear abuse of discretion. See NLRB v. Bell Aerospace Co., 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). The decision to license a particular reactor is also a policy or "assessment of risks" decision within the agency's discretion, provided it has adequately considered all underlying factual issues, including the waste storage issue, and has determined to its own satisfaction that safe methods of production and waste storage are already technologically and economically feasible. Finally, once so assured, the decision to postpone until later the question as to which of several feasible methods should be utilized is also, I believe, a policy, or risk assessment, decision.
This case, however, involves related factual determinations for which we must find support in the statement of basis required by section 553. Of particular relevance here is Table S-3, which reduces the environmental effect of licensing an additional reactor to certain numerical values and, in effect, concludes that it is negligible. The claimed bases for the judgments expressed in numerical terms in Table S-3 are the data assembled by the staff in the draft Environmental Survey, adopted without substantial modification as Table S-3 and thus embodied in the final rule. As the majority indicates, neither the Survey itself, the back-up documentation to which it refers, nor the oral and written testimony offered at the hearing adequately supports these factual conclusions with respect to the waste disposal issue. Majority, supra at 178 U.S.App.D.C. ----, 547 F.2d 645-646. The detailed explanation which characterizes other portions of the Environmental Survey is notably absent from this portion.